IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| PAUL LAURENT, ) | |
| ) | |
| Petitioner, ) | CASE NO. 3:10-cv-0241 |
| ) | JUDGE HAYNES |
| v. ) | |
| ) | |
| STEPHEN DOTSON, Warden, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM

Petitioner, Paul Laurent, a state prisoner, filed this action under 28 U.S.C. § 2254 seeking the writ of habeas corpus to set aside his state court convictions for aggravated kidnapping, attempted aggravated sexual battery, aggravated sexual battery, two counts of sexual battery by an authority figure, and one count of attempted child neglect for which Petitioner received an effective sentence of 17 years. Petitioner's claim is that his trial counsel provided ineffective assistance at trial and sentencing and deprived Petitioner of his Sixth Amendment right to effective assistance of counsel. The Respondent filed an answer that briefed the merits of Petitioner's claims and Petitioner filed a brief in support of his petition. Based upon the state court record, the Court deems an evidentiary hearing unnecessary.

### A. Procedural History

In 2004, after a bench trial, the state trial judge found Petitioner guilty of aggravated kidnapping, attempted aggravated sexual battery, aggravated sexual battery, two counts of sexual battery by an authority figure, and one count of attempted child neglect. State v. Laurent, No. M2005-00289-CCA-R3-CD, 2006 WL 468700, at *1 (Tenn. Ct. Crim. App. Feb. 27, 2006). The trial court sentenced Petitioner to 12 years for aggravated kidnapping, six years for

1

attempted aggravated sexual battery, 12 years for aggravated sexual battery, five years for each count of sexual battery by an authority figure, and two years for attempted child neglect. The trial court ordered Petitioner's sentences for aggravated kidnapping, aggravated sexual battery, and attempted aggravated sexual battery to run concurrent, but consecutive to his sentences for sexual battery by an authority figure and attempted child neglect for an effective sentence of 17 years.

On direct appeal, the Tennessee Court of Criminal Appeal affirmed. On appeal, this Court determined that the trial court: (1) properly denied the motion for judgment of acquittal and motion to dismiss on the aggravated kidnapping charge; (2) the evidence was sufficient to support Petitioner's attempted aggravated sexual battery and aggravated sexual battery convictions; and (3) the trial court properly sentenced Petitioner. Id. The Tennessee Supreme Court denied Petitioner's application for permission to appeal. Id.

Petitioner then filed a state post-conviction petition and after appointment of counsel and an evidentiary hearing, the trial court denied the petition. On appeal, the Tennessee Court of Criminal Appeals affirmed. Laurent v. State, No. M2008-01836-CCA-R3-PC, 2009 WL 2502004, at *1 (Tenn. Ct. Crim. App. Aug. 17, 2009). The Tennessee Supreme Court denied the Petitioner's application for permission to appeal. Id.

### B. Review of the State Record

In Petitioner's direct appeal, the Tennessee Court of Criminal Appeals made the following findings of facts[1] underlying Petitioner's convictions.

---

[1] State appellate court opinion findings can constitute factual findings in a habeas action, Sumner v. Mata, 449 U.S. 539, 546-47 (1981), and have a statutory presumption of correctness 28 U.S.C. § 2254(e).

2

The appellant waived his right to a jury trial. At trial, A.K.[FN1], testified that she was the eighteen-year-old step-daughter of the appellant. At the time of trial, the victim was a senior in high school. The victim stated that she and the appellant had a good relationship when the appellant married her mother, approximately three years prior to the trial, until an episode that occurred when she was in tenth grade. While her mother was out of town on business, the victim caught the appellant hiding in her closet while she was getting dressed.

> FN1. It is the policy of this Court not to identify the victims of sexual abuse.

Several days later, while her mother was still out of town, the appellant took the victim to a movie. At the movie, the appellant offered alcohol to the victim, which she pretended to sip so that the appellant would be "satisfied." When they arrived home, the victim testified that there was a box of chocolate-covered cherries lying on her bed with a pair of her underwear wrapped around them, as well as a vase of flowers on her dresser. The victim claimed that she was "disgusted" and confronted the appellant about the items. According to the victim, the appellant confessed that he had seen her undress a couple of times while hiding in her closet. The victim reported the incident to her mother.

On November 24, 2002, the victim and her fourteen-month old sister, M.L,[FN2] were home with the appellant while her mother was at work. She noticed that the appellant was watching a videotape of one of her dance performances from school. The victim described this as "unusual." That afternoon, the victim woke up from a nap and went into the kitchen to look for something to eat. She noticed that the appellant was "messing with his pants." At that point, the victim stated that the appellant approached her and stated, "I've been thinking about you and I'm crazy about you." The victim ran for the back door, but the appellant stepped in front of it, blocking her path. The victim then tried to run for her bedroom, but the appellant pushed her down before she could reach the door. After falling to the ground, the victim stated that she "wound up" in her bedroom with the appellant. The appellant was "on top" of her and she kept repeating "No, [appellant], please don't do this." The victim explained that she kept trying to lock her legs, but the appellant would use his knee to open them up. She remembered that the appellant held both of her arms and pressed her back against the bed. She believed that the appellant was trying to rape her.

> FN2. M.L is the biological daughter of the appellant and A.K.'s mother, Maria Laurent.

After struggling for a while, the appellant and the victim ended up on the floor, talking. Sometime during the struggle, the victim bit the appellant on the inside of his elbow. The victim thought the appellant stopped because she had asked him to repeatedly. Then, the appellant told the victim that he "was going to do this because he was never going to see her again and that he had to because he

3

and her mother were going to get a divorce." The victim testified that the appellant also told her that he was doing this because she had "teased" him.

The victim tried to calm the appellant down, telling him that she would never tell anyone what happened. The appellant left the room, and the victim proceeded to lock her door, change clothes, gather her purse together (including a can of mace) and try to get out of her bedroom window. She could not open the window and decided to wait in her room until the appellant left the house to pick her mother up from work.

During this time, the appellant continued to talk to the victim through the door. The appellant shook the door handle and was eventually able to open the door. As he came in the room, the victim noticed a rope-like object in his hand. The victim sprayed the appellant in the eyes with mace. The appellant pushed the victim onto the bed and got back on top of her, holding her forearms and pinning them to the bed. The appellant rubbed his eyes against the victim's eyes, burning them with mace. The victim had difficulty seeing with the mace in her eyes. The pain in her eyes lasted for approximately two hours. The appellant took the mace away, threw it down and tried to tie the victim's right hand with a bathrobe sash.

The victim tried to kick her window out in an attempt to escape. The victim was able to turn over onto her stomach and started to crawl off the bed. The appellant grabbed her around the knees and pushed her over, hurting her back. The victim continued to ask the appellant to stop to which he eventually replied, "Okay. I'm not going to fuck you, I just want to kiss you down there." The victim testified that she understood the appellant to mean that he wanted to kiss her vagina. During this time, the victim pleaded with the appellant to allow her to wash out her eyes.

In response to the appellant's statements, the victim kicked off her shoes and unbuttoned her jeans. She testified that she only cooperated with the appellant to get him to calm down. The appellant removed the victim's jeans and left her underwear on. The appellant demanded to see the victim's breasts. The appellant lifted the victim's sweater and placed his hand on her breast. She was not wearing a bra at the time.

After the appellant took her pants off, he licked the victim on the outside of her underwear on her vagina. She testified that he licked her on the outside and inside of the vagina. Specifically, she stated that his tongue, covered by the material from her underwear, entered the inside of her vagina. The victim testified that the appellant continued to lick her vagina "like a dog licking water" for approximately two minutes. Then, the victim got up and told the appellant that she needed to wash her eyes. The appellant asked for a kiss, so the victim complied because she thought if she cooperated with the appellant, she would not get raped.

4

At that time, the victim went to her bathroom and began to rinse out her eyes. The appellant followed her, grabbed her by the buttocks and slid his hand across her behind. The appellant also washed his eyes. The victim then left her bathroom and went to the appellant's bathroom. The appellant followed her and once again placed his hand on her buttocks. The victim then told the appellant that she was going back to her bathroom, but instead ran out the back door of the house and down the street wearing only a sweater, underwear and socks.

The victim ran down the street, trying to flag down passing vehicles. She finally stopped a van containing Dorothy Ailey and her husband. The Aileys stopped when they saw the victim running toward the car, waving her hands and crying "let me in." Ms. Ailey described the victim as "hysterical." Ms. Ailey remembered that the victim had no pants on at the time. The couple let the victim into their vehicle, where she gave them her address and stated "he was going to kill her if she didn't get away." Ms. Ailey let the victim use her cellular phone to call her mother. The victim told her mother that she had been raped. The couple drove the victim to the nearby Shell station, called the police and waited until the police arrived.

Hannah Tiblier, a nurse practitioner with Metro General Hospital, testified that she performed a medical exam on the victim on November 24, 2002. The exam involved a general examination of the body and more specific exam of the genitalia. The victim told Ms. Tiblier the following:

He [the appellant] came into my room with a rope in his hand. I sprayed him in the eyes with mace and he threw me on the bed and tried to rub it in my eyes. He tied my right arm to the bed, but I got out of it. I bit him hard on the arm. He pulled my pants off and put his head down there, my panties were still on though. He touched my breasts and he kissed me. I kept rinsing my eyes. The burning was unbelievable. I finally ran out of the house and didn't have my pants on. I wanted out of there.

The victim told Ms. Tiblier that she was not sure if there was sexual penetration. During the examination, Ms. Tiblier noticed a fresh scratch over the victim's right rib cage as well as a fresh scratch on the back of her right wrist. As part of the examination, labial swabs were collected from the victim. Additionally, the victim's panties were collected as evidence in order to preserve any possible fluids located on them.

After the call came in regarding the victim, Nicole Swisher, a Sergeant with the Metropolitan Nashville Police Department responded to the appellant's residence on November 24, 2002. As the officers entered the house, the smell of mace was very strong. Sergeant Swisher located a baby, fourteen-month-old M.K., inside the house alone, asleep in a stroller. Once they rescued the child, they exited the house to preserve the scene.

5

Robert Carrigan, a detective with the Metropolitan Nashville Police Department met with the victim and her mother, Maria Laurent, at the residence after the incident. Detective Carrigan noticed that the victim's room was in disarray and that there was a bottle of chemical spray or mace and a belt from a bathrobe on the floor. The appellant was not at the scene, and his car was missing.

The next morning, Detective Carrigan received word that the appellant was at his residence. When they arrived, the appellant was not present. However, after a search Detective Carrigan and other officers discovered a suitcase packed with men's clothing in a shed behind the house.

Later that day, Detective Carrigan met Ms. Laurent at the house where they found a letter from the appellant on the kitchen table. The letter stated as follows:

> Dear Maria, I've never been more sorry in all my life. I should have listened to you and sought some help. I love you and [our daughter] dearly. I am such a weak individual. I should have been the adult and walked away. [Victim], I am truly sorry. I have a huge problem that started when I was just a kid. I have nowhere to go and nowhere to turn to except Jesus. If there's any way that this situation can be fixed or mended, whatever you say Maria, I'll do. I still have my beeper with me, so you can reach me that way, if you want to. Please say a prayer for me. All my love, [Appellant].

Ms. Laurent identified the handwriting as that of the appellant. Upon direction from Detective Carrigan, Ms. Laurent placed several calls to the pager number that the appellant left in the letter. During one of those conversations, the appellant agreed to meet Ms. Laurent in the parking lot of Antioch High School. Ms. Laurent waited for the appellant at the designated location, but the appellant never appeared. The appellant eventually turned himself in to the police on December 9, 2002.

Hunter Greene, a DNA analyst with the Tennessee Bureau of Investigation, testified as an expert in serology. Ms. Greene testified that chemical analysis of the victim's underwear revealed the presence of alpha amylase, a component of saliva, in concentrations consistent with the presence of saliva.

Maria Laurent, the victim's mother, testified that she has two other daughters in addition to the victim. Her two young daughters are biologically the appellant's. Ms. Laurent recalled that at some point after her marriage to the appellant, she and one of her daughters traveled to Dallas, Texas in connection with her work for American Airlines. Sometime later she learned that while she was gone, the appellant hid in the victim's closet and saw her get undressed. The appellant explained that he was playing hide-and-go-seek and had accidentally seen her undress. The appellant also told Ms. Laurent that he gave the victim alcohol, chocolate and roses in an attempt to apologize for hiding in her closet.

6

> Ms. Laurent testified that the appellant had a particular interest in performing oral sex with her while she was wearing underwear. Ms. Laurent further stated that she had never discussed the appellant's desires or interests in regards to oral sex with the victim.
>
> On November 24, 2002, Ms. Laurent was at work. The appellant was supposed to pick her up when her shift was over at 7:00 p.m. However, Ms. Laurent left work early when she received a telephone call from the victim. Over the course of the next few days, Ms. Laurent was able to reach the appellant on his cell phone several times. At least one of these conversations was recorded.
>
> Ms. Laurent confirmed that during several of these conversations, the appellant apologized for his actions and promised to get professional help. The appellant told Ms. Laurent that the victim was "teasing" him and that he was sexually aroused by her. Ms. Laurent even discovered that the appellant had placed a new doorknob on the victim's bedroom door.

Laurent, 2006 WL 468700 at *1-5. The state appellate court's other factual findings are set forth in the context of the Petitioner's claims.

### C. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state

court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings, as opposed to dicta" of its decisions "as of the time of the relevant state-court decision." Id. at 412.

In Greene v. Fisher, _U.S._, _S. Ct._, 2011 WL 5335411, at *2 (2011), the Supreme Court considered whether "'clearly established Federal law' includes decisions of this Court that are announced after the last adjudications of the merits in state court but before the defendant's conviction becomes final" and answered the question in the affirmative. There, a Supreme Court decision at issue was rendered two months after the state supreme court upheld the petitioner's convictions. The Supreme Court held that its decision was not clearly established at the time of the state supreme court's decision. Id. at *3-5. The Supreme Court noted a different result if the Petitioner had applied for the writ of certiorari or had filed a state post-conviction petition. Id. at *5.

In Bell v. Cone, 535 U.S. 685, 693 (2002), the Supreme Court reiterated that the AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law." Under the "unreasonable application" clause, a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant decision applied clearly

8

established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

In reaching this decision, the Supreme Court reiterated that the claims were to be decided on the record before the state court:

> In this and related contexts we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it. See Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) 124 S.Ct., at 4 (denying relief where state court's application of federal law was "supported by the record"); Miller-El v. Cockrell, 537 U.S. 322, 348, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court"); cf. Bell v. Cone, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added). The district court also "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 738 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes credibility findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

### 1. Ineffective Assistance of Counsel Claim

In his post-conviction appeal, Petitioner asserted the following ineffective assistance of counsel claims:

> (1) trial counsel failed to properly interview witnesses prior to trial; (2) trial counsel improperly waived the preliminary hearing, denying Petitioner the right to confront the victim prior to trial; (3) trial counsel failed to put forth a theory of defense at trial; (4) trial counsel failed to seek mitigation at sentencing; (5) trial

9

counsel allowed Petitioner to make statements against interest in the presentence report; (6) trial counsel allowed Petitioner to submit a "Statement of Allocution" into evidence at the sentencing hearing; (7) trial counsel requested a presentencing psycho-sexual evaluation that was later used against Petitioner.

2009 WL 2502004, at *5.

The Tennessee appellate court made the following findings of fact on those claims:

At the hearing on the post-conviction petition, trial counsel testified that he had been practicing law for approximately eighteen years at the time of the hearing. During that time, he spent eight years as an Assistant United States Attorney and four years as an Assistant Director of the Drug Investigation Division at the Tennessee Bureau of Investigation prior to entering the private practice of law in April of 2002. At the time of Petitioner's trial, trial counsel had tried one jury trial as a criminal defense attorney.

Trial counsel explained that he waived the preliminary hearing in Petitioner's case because he wanted to prevent potentially more serious charges from being presented to the grand jury. Prior to trial, trial counsel established a theory of defense for the case. According to trial counsel, the State would be unable to establish each element of the offense charged. However, trial counsel advised Petitioner to waive a jury trial due to the facts surrounding the incidents. Trial counsel was afraid that the facts of the case would horrify a jury. Trial counsel recalled that Petitioner maintained that the victim "baited him." Trial counsel felt that waiving a jury trial would take sympathy and emotion out of the equation.

Trial counsel admitted that he did not interview the State's witnesses prior to trial. Trial counsel recalled one episode in which he contacted the victim's mother. The mother was hostile, and he determined that pursuing the matter would be fruitless. As a result of his failure to interview witnesses prior to trial, trial counsel actually asked questions at trial that he did not know what the answer would be from the witness. Specifically, trial counsel remembered asking Ms. Ailey, the woman who picked up the victim in the street, if the victim mentioned that she had been raped. Ms. Ailey answered that the victim did not tell her that she had been raped but told "her mother." Trial counsel felt that even if he had known the answer the witnesses would have given he probably would have still asked the question at trial. Trial counsel admitted that he asked Nurse Tibler a question regarding the victim's scratches that he should not have asked and would not have asked had he interviewed the witness prior to trial.

Trial counsel informed the trial court that he attempted to contact a coworker and friend of the victim who, according to Petitioner, would have corroborated his story that the victim set him up. Trial counsel was unable to locate this witness.

10

Trial counsel recalled that he had Petitioner prepare an allocution statement prior to sentencing. Trial counsel felt that this was a way for Petitioner to appear apologetic to the trial court and was a way to avoid rearguing issues that had already been decided. Trial counsel encouraged Petitioner to be truthful because, in his experience, judges look favorably on defendants who are cooperative and apologetic.

Trial counsel requested a presentencing psycho-sexual evaluation and submitted Petitioner's work history as a mitigating factor to the trial court. Trial counsel chose not to call Petitioner as a witness at the sentencing hearing based on his previously inflammatory statements regarding the victim. Further, trial counsel did not feel that Petitioner would perform well during cross-examination.

The post-conviction court took the matter under advisement at the conclusion of the hearing. In an order, the post-conviction court found Petitioner's allegations to be without merit. Specifically, the post-conviction court determined that trial counsel gave reasonable advice to Petitioner in waiving the preliminary hearing because the defense was focused on an application of the law rather than the facts. Further, the post-conviction court found that trial counsel had access to the State's file through discovery. The post-conviction court also concluded that trial counsel did not render ineffective assistance with regard to his cross-examination of witnesses Ms. Ailey and Nurse Tibler at trial. The post-conviction court determined that rape was not an issue and the comments made by the nurse were not prejudicial because the victim's testimony also established the element of bodily injury.

Next, the post-conviction court determined that even if Petitioner's work history had been somehow verified at the sentencing hearing, it would not have made a difference. The work history indicated that Petitioner had been employed for less than ten years even though he was forty-four years old at the time of the hearing.

Finally, the post-conviction court found that trial counsel's actions with regard to the psychosexual examination were required by Tennessee Code Annotated section 39-13-705, and thus could not be considered ineffective assistance of counsel. Additionally, it was not ineffective assistance of counsel for trial counsel to encourage Petitioner to be truthful in a presentence report.

Id. at *5-7.

In its rulings on these claims, the Tennessee appellate court concluded that Petitioner's claims involved strategic decisions of counsel or failed to show prejudice from trial counsel's cited failures.

11

*Ineffective Assistance of Counsel*

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. See Powers v. State, 942 S.W.2d 551, 558 (Tenn.Crim.App.1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn.1975). [Relying on federal law]. In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. See Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." Henley v. State, 960 S.W.2d 572, 580 (Tenn.1997).

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. See id. at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact ...; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. Burns, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. See Adkins v. State, 911 S.W.2d 334, 347 (Tenn.1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. See id. However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. See Cooper v. State, 847 S.W.2d 521, 528 (Tenn.Crim.App.1992).

*Investigation Prior to Trial*

Petitioner claims that trial counsel failed to conduct independent pretrial investigation of the State's witnesses. Petitioner claims that this failure resulted in ineffective assistance of counsel. The State contends that trial counsel's pretrial investigation was sufficient.

**The proof at the post-conviction hearing established that trial counsel failed to interview the State's witnesses prior to trial. Admittedly, it is unwise for any criminal defense attorney not to at least make an effort to have potential**

12

witnesses interviewed even if the witnesses are uncooperative. However, trial counsel testified that he had access to the State's files through discovery, including all police reports, statements of witnesses, and the medical evidence. In addition, Petitioner failed to establish at the post-conviction hearing just how the failure to interview witnesses created a reasonable probability that had counsel conducted the interviews, the results of his trial would have been different. He has not established actual prejudice and therefore is not entitled to a finding that counsel was ineffective in failing to interview witnesses. This issue is without merit.

*Cross-examination of Witnesses*

Petitioner complains that trial counsel examined witnesses without knowing how they would respond and that this was prejudicial to his defense. Specifically, Petitioner alleges that his lack of preparation prior to trial led to additional evidence being introduced about bodily injury suffered by the victim, an essential element of the offenses of aggravated sexual battery and attempted aggravated sexual battery. The State alleges that Petitioner failed to show he was prejudiced by trial counsel's actions.

At trial, trial counsel questioned Ms. Ailey, the person who rescued the victim from the street. Trial counsel asked if the victim claimed that she was raped. Ms. Ailey responded that the victim told "her mother" that she was raped. Next, trial counsel asked Nurse Tibler if the victim's scratches appeared to be recent. She responded affirmatively and informed trial counsel that the victim's eyes were red and she continuously rubbed them. Petitioner was not charged with rape at trial. In other words, this was not an issue that could have affected Petitioner's convictions. Further, the victim herself testified that Petitioner held her down and attempted to tie her down and rubbed mace in her eyes. The victim's testimony alone would have been sufficient to establish bodily injury. Petitioner has failed to show that he was prejudiced by trial counsel's actions.

*Sentencing*

Next, Petitioner claims that he received ineffective assistance of counsel at sentencing. Specifically, Petitioner claims that trial counsel's decision to encourage Petitioner to submit an allocution statement and participate in a psycho-sexual evaluation coupled with the failure of trial counsel to elicit testimony regarding Petitioner's work history led to the imposition of consecutive sentences by the trial court. The State contends that the post-conviction court properly determined that Petitioner did not receive ineffective assistance of counsel.

With regard to the psycho-sexual evaluation it is difficult to see how counsel can be ineffective when such an evaluation is required for the pre-sentence

13

> report of all sex offenders. *See* T.C.A. § 39-13-705(b). Further, the post-conviction court found that encouraging Petitioner to be truthful and present an allocation at the sentencing hearing in an effort to establish his remorse was a reasonable strategy. We agree and note again that this court may not second guess a reasonable strategic decision on the part of the trial counsel even if the strategy was unsuccessful.
>
> Finally, Petitioner seems to complain that the trial court relied on a record of extensive criminal history in ordering consecutive sentences when in fact Petitioner had no prior convictions. **There is no evidence in the record to support this allegation. Moreover, this Court has already upheld the sentencing determination on direct appeal.** Paul Neil Laurent, 2006 WL 468700, at * 14.
>
> Petitioner has failed to carry his burden of proof that he received ineffective assistance of counsel at trail.

Id. at *7-9.

To establish ineffective assistance of counsel, Petitioner must demonstrate that under the totality of the circumstances, his trial counsel performed deficiently and that counsel's performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 695 (1984). As the Supreme Court has explained:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

14

> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
>
> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decision, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id. at 690-91.

In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Id. at 691 (emphasis added). Counsel's failure "to conduct constitutionally adequate pretrial investigation into potential

evidence" can "hamper[] [their] ability to make strategic choices." Harries v. Bell, 417 F.3d 631, 639 (6th Cir. 2005). A court must examine not only to the individual errors of counsel, but must also view the effect of the errors cumulatively. See Draper v. Adams, 215 F.3d 1325, 2000 WL 712376, at *3 (6th Cir. May 23, 2000).

To establish prejudice due to his counsel's errors or omissions, Petitioner must establish a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Williams, 529 U.S. at 390-91. In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland, 466 U.S. at 694.

As to Petitioner's trial counsel's pretrial investigation and cross-examination at trial, the state courts found that prior to trial Petitioner's counsel had witnesses' statements, the police report, the state prosecutor's files and the victim's medical records. Petitioner's counsel attempted to locate a witness to corroborate Petitioner's justification for the assault, but could not locate the witness. (Docket Entry No. 13-9, Transcript at 22). Petitioner's counsel talked to Petitioner's wife to arrange a meeting of Petitioner and his wife, but the wife's demeanor suggested the meeting would not be welcomed. Id. at 33. With the Petitioner's admission to the conduct on tape and in a letter as well, his counsel's defense strategy was limited. Id. at 36, 37. With these materials, the state courts could reasonably conclude that Petitioner's trial counsel's pretrial investigation was adequate and Petitioner failed to show actual prejudice for any omissions. As to cross-examination, the state courts could reasonably characterize counsel's questioning of witnesses as a strategic decision under Strickland. Given that the state courts

16

found sufficient evidence for Petitioner's convictions and Petitioner's failure to challenge the sufficiency of the evidence on those convictions in this action, this Court concludes that the state courts could reasonably find the lack of prejudice on counsel's cross-examinations.

Petitioner asserts that he was also denied the effective assistance of counsel at sentencing when his attorney advised Petitioner to submit to a sexual offender evaluation and introduced an allocution statement by Petitioner. The trial court then relied on that allocution statement upon sentencing Petitioner to consecutive sentences as a violent offender. The state courts found Petitioner's counsel's advice on the allocution statement at sentencing was a reasonable strategy. As to psycho-sexual evaluation, such an evaluation is required by Tennessee law. Tenn. Code Ann. § 39-13-705.

As to the allocution statement, Petitioner's counsel was concerned about Petitioner's prior "inflammatory statements regarding the victim." Petitioner had made several prior inflammatory statements regarding the victim, such as his 17-year-old stepdaughter "teased him" and "baited him." Laurent, 2009 WL 2502004 at *2, 6. These statements were contrary to the proof that the victim escaped from the Petitioner during the attack and fled with only a sweater, underwear, and socks. Id. at *3. The victim also had scratches to her rib cage and wrist. Id. In Petitioner's trial counsel's view, the allocution statement allowed "Petitioner to appear apologetic to the trial court and was a way to avoid rearguing issues that had already been decided." (Docket Entry No. 13-17 at 9). Counsel encouraged the Petitioner to be truthful in the statement and to seek the mercy of the Court. (Docket Entry No. 13-9 at 39). With these facts, the state courts could reasonably conclude

17

that Petitioner's sentencing claim involved a strategic decision of counsel that had a valid factual basis. As a strategic decision of counsel, this claim is not actionable under <u>Strickland</u>.

For these reasons, the Court concludes that the petition for the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

**ENTERED** the _8th_ day of December, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge